UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/20/2016
```

----------------------------------------------x

TERRY BETTIS, Individually and on Behalf of all
Others Similarly Situated,

        Plaintiff,

        v.

        16 Civ. 00025 (CM)

AIXTRON SE, MARTIN GOETZELER, and
BERND SCHULTE

        Defendants.

----------------------------------------------x

**MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**

McMahon, C.J.:

      Lead Plaintiff Robert Hajosy, through his attorneys at Glancy Prongay & Murray LLP,

bring this action on behalf of the class of people who bought shares of Defendant Aixtron SE

("Aixtron") between September 25, 2014 and December 9, 2015 (the "Class Period"). Plaintiff

alleges that Aixtron and two of its officers – Defendant Martin Goetzeler, Aixtron's Chief

Executive Officer ("CEO"), and Defendant Bernd Schulte, Aixtron's Chief Operating Officer

("COO") – made false or misleading statements that induced Plaintiff and others similarly

situated to purchase Aixtron shares; when the truth became known, the value of Aixtron shares

dropped precipitously, causing Plaintiffs to suffer economic damage. *See* Securities Exchange

Act of 1934 ("Exchange Act") § 10(b), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

      For the reasons discussed below, Defendants' motion to dismiss is GRANTED.

## FACTS

The following facts are alleged in Plaintiff's Amended Class Action Complaint (the "Complaint" herein) or are contained in Defendant Aixtron's public disclosure documents filed with the Securities and Exchange Commission ("SEC").[1]

Aixtron is a German technology company that develops manufacturing equipment for customers in the semiconductor industry. In particular, Aixtron's business includes developing, producing and installing equipment for the deposition[2] of semiconductor materials, process engineering, consulting, and training. (Compl. [3] ¶ 2.) Customers use Aixtron's technology solutions to build advanced components for electronic and optoelectronic applications used in displays, signaling, lighting, fiber-optic communication systems, wireless and mobile telephony applications, optical and electronic storage devices, and computing. (*Id.*)

Aixtron operates in a highly competitive industry. Its business depends on a limited number of customers in several concentrated industries and, in particular, relies heavily on customers in Asia. (Declaration of Kimberley A. Haviv ("Haviv Decl.") Ex. 1 at 6-8.) If a principal customer ends its relationship with Aixtron, the company's financial and operational success could be severely impacted.

Moreover, Aixtron operates in a market affected by rapid technological change; in order for Aixtron to compete effectively, it must persistently and quickly bring new products to market. (*Id.*) Thus, when a customer orders new manufacturing equipment from Aixtron, it does

---

[1] On a motion to dismiss, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] Deposition is a process by which material is transferred onto a thin slice of semiconductor material, or a "wafer."

[3] Citations refer to Plaintiff's Amended Complaint (Dkt. # 24).

not purchase a ready-made product off the shelf. Instead, Aixtron and the customer work together to test and tailor the equipment to meet customer or industry specifications. This process is called "qualification."

Because Aixtron's customer orders are subject to qualification, the company must expend considerable effort and resources in lengthy sales cycles in order to consummate customer orders. (*Id.*)

One of Aixtron's advance technology manufacturing tools is called the AIX R6 Metal-Organic Chemical Vapour Deposition ("MOCVD") system. (Compl. ¶ 2.) The tool is designed to produce light-emitting diodes ("LEDs") chips. Significantly, the AIX R6 MOCVD tool was critical to Aixtron's overall financial performance and also to its long-term positioning within the LED market. (*Id.* ¶ 2.)

On September 25, 2014, Aixtron announced that a Chinese company – San'an Optoelectrics Co., Ltd. ("San'an") – placed a groundbreaking order of 50 AIX R6 MOCVD tools from Aixtron (*Id.* ¶ 22.) This order, like Aixtron's other orders, was subject to qualification.

Following the announcement, Aixtron's American Depository Receipts ("ADRs") increased $3.07 – over 24% – and closed at $15.67 per ADR the following day, on September 26. (*Id.* ¶ 23.)

Plaintiff complains that Aixtron's representations about the San'an order, made over the course of approximately one year following the announcment, were materially false or misleading.

### 1. Aixtron's General Risk Disclosures

Given the various risks associated with investing in Aixtron's volatile business, the company has included a set of general risk disclosures in its yearly SEC filings. These risk

disclosures include warnings related to the extensive sales and qualification processes required for products that are ordered by prospective customers. Both Aixtron's 2013 Form 20-F (filed February 25, 2014) and its 2014 Form 20-F (filed February 24, 2015) included the following statements:

- AIXTRON faces lengthy sales and qualification cycles for its products and, in many cases, must invest a substantial amount of time and funds with no assurance that these efforts or expenditures will result in revenues. (Haviv Decl. Ex. 1 at 7; Haviv Decl. Ex. 6 at 7.)

- At any given time, some of AIXTRON's products are being tested to determine whether they meet customer or industry specifications. During such a qualification period, AIXTRON invests significant resources and dedicates substantial production capacity to the manufacture of these new products, prior to any commitment to purchase by the prospective customer and without generating significant revenues from the qualification process. If AIXTRON was unable to meet these specifications or does not receive sufficient customer orders to profitably use the dedicated production capacity, its business, financial condition, results of operations and cash flows could be materially and adversely affected. (*Id.*)

- The time it takes the Company to build a product to customer specifications, which the Company refers to as the build cycle, typically ranges from three to nine months, followed in certain cases by a period of customer acceptance during which the customer evaluates the performance of AIXTRON's system and may potentially reject such system. (Haviv Decl. Ex. 1 at 8; Haviv Decl. Ex. 6 at 8)

- AIXTRON may increase production in anticipation of customer orders that may not materialize, which would negatively affect the Company's operating results. . . . AIXTRON has in the past experienced . . . outright cancellation of orders. (Haviv Decl. Ex. 1 at 10; Haviv Decl. Ex. 6 at 10.)

### 2. Aixtron's Specific Representations about the San'an Order

From September 25, 2014 to October 27, 2015, Aixtron made various statements about the San'an transaction and its qualification process in press releases, conference calls, and SEC filings. The representations at issue in this case are as follows:

### A. September 25, 2014 Press Release and Conference Call

On September 25, 2014, Aixtron announced the large San'an order of 50 AIX R6 MOCVD tools in a press release entitled, "AIXTRON receives large multiple tool order from China; San'an Optoelectronics expands production capacity with AIXTRON'S Next Generation tool." This press release stated:

> San'an Optoelectronics Co., Ltd. has ordered 50 Next Generation Showerhead® MOCVD tools from AIXTRON. This is one of the largest orders the Company has ever received and is growing evidence that LED manufacturers are beginning to expand production capacity to meet the constantly increasing demand for LEDs.

(*Id.*)

### B. October 28, 2014 Conference Call

On October 28, 2014, Aixtron held a conference call with investors and analysts to discuss its financial results for the third quarter of 2014. (*Id.* ¶ 27.) During the call, Aixtron's CEO, Defendant Martin Goetzeler, stated:

> The good news is that in Q3, we received an order from the Chinese company San'an Optoelectronics Limited for [over] 50 next generation MOCVD Showerhead tools. This represents the largest order that AIXTRON has ever received and is growing evidence that LED manufacturers are beginning to expand production capacity to meet the constantly increasing demand for LEDs in general lighting. . . . In light of this new generation product introduction we are proud that we have been awarded by San'an Optoelectronics, a leading global Chinese energy player, with an order of 50 of our next generation tools already today. We clearly see this decision as a confirmation of our product road map and development strategy. By this landmark order[], we are very encouraged to launch our next generation tool very soon. So I ask for your understanding that we cannot share more details on this tool right now.

(*Id.*) When asked by an analyst whether Aixtron was holding back because it was waiting on qualification from San'an, Goetzeler responded, "Yes, we actually are looking for the right point and time to announce it and also the right place, so that's the reason why we didn't announce it yet." (*Id.*)

### C. November 6, 2014 Press Release

On November 6, 2014, Aixtron issued a press release entitled, "AIX R6 Sets New Standards in LED Manufacturing; AIXTRON's Next Generation MOCVD Tool Excels through Top Level Production Performance, Lowest Cost of Ownership and Majority Productivity Increase." (*Id.* ¶ 29.) The press release stated that "[t]he groundbreaking order we have received from San'an proves that our new AIX R6 already convinced a key market player through its performance and value proposition ahead of today's official launch of the tool." (*Id.*).

### D. February 24, 2014 Press Release and Form 20-F

On February 24, 2014, Aixtron issued a press release entitled, "AIXTRON anticipates growth in all technology areas and further improvement of results in 2015; Positive EBITDA expected for H2/2015 /AIXTRON improves revenues and equipment order intake in 2014." (*Id.* ¶ 34.) The release further stated, "The Company's order intake was not influenced by a large multiple tool order from a Chinese LED manufacturer for 50 AIX R6 Showerhead MOCVD tools AIXTRON received in September 2014 as most of this order will be booked in the course of the financial year 2015." (*Id.*) The press release also included a remark by Goetzeler stating, "[W]e have achieved an important milestone with the market launch of the AIX R6 and a resultant major order in the previous year." (*Id.*)

On the same day, Aixtron filed with the SEC its Annual Report on Form 20-F for the fiscal year, which ended on December 31, 2014. This was one of the Form 20-Fs that contained the general disclosures set out above. In the Form 20-F, Aixtron reaffirmed the statements contained in the press release issued that day. (*Id.*) Specifically, Aixtron stated:

> In September 2014, AIXTRON received a large multiple tool order from Chinese LED manufacturer San'an Optoelectonrics Co., Ltd. who has ordered 50 of these new AIX R6 tools. The order is being processed and will have an impact on order intake and revenues in 2015 and beyond. Management believes that this groundbreaking order by a key

6

market player shows the strong performance and value proposition of the new tool. . . . The new AIX R6 tool is currently being qualified for mass production at a number of different customers. Management expects that the timing of the qualification process could vary depending on individual specification criteria and the experience levels customers have with AIXTRON's showerhead technology.

(*Id.*)

### E.   April 28, 2015 Press Release and Form 6-K

On April 28, 2015, Aixtron issued a press release entitled, "AIXTRON: Earnings position improved, outlook confirmed; Technology portfolio strengthened by acquisition of PlasmaSi / Qualification of new AIX R6 is moving forward." (*Id.* ¶ 37.) The release also stated, "For the first time, the Company's order intake and revenues were influenced by the large multiple tool order from a Chinese LED manufacturer for 50 AIX R6 Showerhead MOCVD tools AIXTRON received in September 2014. However, a large portion of this order will be booked in the course of the financial year 2015." (*Id.*)

On the same day, Aixtron filed a Form 6-K with the SEC, which contained its Quarterly Group Financial Report for the first quarter of 2015 (for the fiscal quarter that ended on March 31, 2015). (*Id.* ¶ 38.) The Form 6-K reaffirmed Aixtron's statements announced in the press release issued that day. (*Id.*)

### F.   July 28, 2015 Press Release,  Form 6-K, and Conference Call

On July 28, 2015, Aixtron issued a press release entitled, "AIXTRON: Order backlog supports strong growth in H2/2015; Customers proceed with qualification process of AIX R6." (*Id.* ¶ 40). The press release included a statement by Goetzeler: "In the context of the qualification of our new MOCVD tool AIX R6, we have been working intensively with our customers. Thereby, specific additional costs are reflected in the unsatisfactory result of the second quarter. Overall, we have agreements with eight customers for the AIX R6, of which one

has recently qualified the system for production." (*Id.*) The press release also stated that Aixtron's revenue forecast "includes expected shipments of AIX R6 MOCVD tools which still depend on successfully reaching customer specific milestones within their individual production qualification processes." (*Id.*)

On the same day, Aixtron filed a quarterly report with the SEC on Form 6-K for the fiscal quarter that ended on June 31, 2015. (*Id.*) The Form 6-K reaffirmed Aixtron's statements announced in the press release issued that day. (*Id.*)

On July 28, Aixtron also held a conference call with analysts to discuss the company's financial results for the second quarter of 2015. (*Id.* ¶ 43.) During the conference call, Goetzeler stated:

> Q2 was a challenging quarter, having been influenced by the ongoing qualification process of our AIX R6, with the respective effects on our margin. Nevertheless, we expect the growth necessary to achieve our guidance in the second half. . . . The weak revenue numbers are a clear reflection of not only the cautious investment behavior of our customers, but also of the AIXTRON R6 qualification process, which has caused potential buyers to wait and see how the product performs rather than buying the old generation of the equipment.

(*Id.*) Schulte then stated:

> Let me start by talking about the AIX R6 showerhead tool, our latest generation of MOCVD equipment, which is not only important to our overall financial performance in this year, but also to the long term position of AIXTRON within the LED market. The good news is that we have had the AIX R6 production qualified at one LED manufacturer. Including this customer, we have secured orders from now eight different customers, up from seven in the previous quarter. We are also getting additional inbound inquiries and interest from customers. However, we should not hide the fact, together with our major customers, that it has taken longer than we would have liked to get the AIX R6 to the production stage. Based on detailed programs regarding hardware and process, we are closely collaborating with our customers to support their qualification targets.

When asked by analysts "what is the problem" with the San'an order and when they should be expecting deliveries, a "final decision," or when "the order [will] progress as planned," Schulte answered:

> [T]he status of the San'an order is that . . . we are in the process of qualifying the tool with this particular device of the customer. And this status is ongoing and probably will lead us until end of the year. And we still expect to ship some systems this year, but we currently assume that the majority of shipments will be going into next year.

(*Id.*)

### G. August 4, 2015 Statement

A week later, on August 4, 2015, Aixtron released a statement regarding its first-half revenue and conveyed information related to customer qualifications for the AIX R6 MOCVD tool. (*Id.* ¶ 45.) Aixtron reported that "margin [was] suppressed by delayed customer qualifications for AIX R6 MOCVD tool." The statement also included a remark by Goetzeler:

> The weak revenue numbers are a clear reflection of not only the cautious investment behavior of our customers, but also of the AIX R6 qualification process, which has caused potential buyers to wait and see how the product performs other than buying the whole generation of equipment.

(*Id.*) Additionally, the August 4 statement reiterated Schulte's outlook from the prior week:

> We have had the AIX R6 production qualified at one LED manufacturer. Including this customer, we have secured orders from now eight different customers up from seven in the previous quarter . . . However, we should not hide the fact, together with our major customers, that it has taken longer than we would have liked to get the AIX R6 to the production stage. Based on detailed programs regarding hardware and process, we are closely collaborating with our customers to support their qualification targets.
>
> Due mainly to the AIX R6 MOCVD tool's ongoing production qualification process and the resulting actual and anticipated modification costs and inefficiencies, the cost of sales has risen . . . .

(*Id.*)

### H. October 13, 2015 Press Release

On October 13, 2015, Aixtron issued a press release stating that it was revising its previously issued revenue guidance for the year 2015 due to "postponement of shipments to a large Chinese customer which were planned for delivery in 2015." (*Id.* ¶ 47.) Aixtron also announced that "[t]hese deliveries are now expected for 2016 depending on the progress of the ongoing milestone based qualification process." (*Id.*)

Following the press release, Aixtron's ADRs fell $0.84 per ADR – or 12.8% – to close at $5.71 per ADR on October 13, 2015. (*Id.* ¶ 48.)

### I. October 27, 2015 Press Release, Form 6-K Form, and Conference Call

On October 27, 2015, Aixtron issued a press release entitled, "AIXTRON: Revenue increase in Q3/2015 based on broad foundation; Positive EBITDA in Q3/2015 due to favorable product mix." (*Id.* ¶ 49.) In the press release, Goetzeler stated, "Due to postponed shipments, in particular of the AIX R6 showerhead system, we have recently revised our expectations for the current financial year. However, we work intensively with our customers to push forward and to successfully complete the qualification processes." (*Id.*) The press release further stated that, "The guidance was revised due to a postponement of shipments to a major Chinese customer which were planned for delivery in 2015. These deliveries are not expected for 2016 depending on the progress of the ongoing milestone qualification process." (*Id.*)

On that day, Aixtron also filed with the SEC a Form 6-K containing its 2015 Nine Month Group Financial Report for the fiscal quarter that ended on September 30, 2015. (*Id.* ¶ 50.) The Form 6-K reaffirmed Aixtron's statements announced in the press release issued that day. (*Id.*)

On the same day, Aixtron also held a conference call with analysts to discuss its 2015 third quarter financial results. (*Id.* ¶ 52.) On the call, an analyst asked for an update on the

progress of the San'an order and asked how far the company was from qualification and getting

shipments to San'an. (*Id.*) Schulte responded:

> [W]e have a defined milestone plan with our customer, and we achieved, according to the timing of the first milestone that has been accomplished, but there are, obviously, more specs to go, which we're working on. But we're quite confident that we are following this milestone plan successfully.

> So, the next milestone will be by the end of the year, and there will be other milestones in early 2016. So we're following the plan. So, we are on plan. (*Id.*)

### 3.  Drastic Reduction of San'an Order

On December 9, 2015, Aixtron issued a press release announcing that it had "reached an

agreement with its Chinese customer San'an Optoelectronics regarding a substantial reduction in

the volume of AIX R6 MOCVD systems ordered from [fifty] to the three which have already

been delivered." (*Id.* ¶ 54). Aixtron also disclosed that "the customer's specific qualification

requirements were not achieved." (*Id.*)

Following this news, Aixtron's ADRs fell $3.05 per ADR – or 40% – over two trading

days and closed at $4.49 per ADR on December 10, 2015. (*Id.*)

### 4.  Termination of Government Subsidies

Approximately one year before Aixtron's order from San'an was significantly reduced –

but after it was placed – the Chinese central government ordered its subordinate agencies and

local governments to stop offering subsidies and tax incentives for China-based LED wafer and

chip makers. (*Id.* ¶ 31.) News of this decision was reported in a December 22, 2014 article by

*Digitimes*, a daily news publication that covers Asia's information technology industry[4]:

> China-based San'an Optoelectronics, Xiamen Changelight and HC SemiTek are the three largest recipients of government subsidies . . . Xiamen City Government has offered a subsidy of CNY1 billion (US $163 million) plus orders worth CNY3 billion for San'an and thus the company has planned to invest CNY10 billion to add 200 MOCVD sets . . . The termination of government subsidies and tax incentives is expected to curb capacity

---

[4] *See* http://www.digitimes.com/about.asp

expansion by China-based makers and consequently supply and demand of LED chips may return to balance in 2015."

(*Id.*) On December 24, 2014, *BizLED Magazine*, an India-based LED industry-focused news magazine,[5] reported substantially the same news. (*Id.* ¶ 32).

There is no indication in the pleadings that the news was reported more widely. Specifically, there is no indication that the news was reported in the United States.

## PROCEDURAL HISTORY

On January 4, 2016, a class of shareholders filed the instant putative securities fraud class action against Aixtron, its chief executive officer, Martin Goetzeler, and its chief financial officer, Bernd Schulte. (Dkt. No. 1). On May 9, 2016, the Court appointed Robert Hajosy to serve as lead plaintiff. (Dkt. No. 20). An Amended Complaint – the operative complaint in this action – was filed on June 8, 2016. (Dkt. No. 24).

The Amended Complaint asserts claims for securities fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants (Count I) and control person liability under Section 20(a) of the Exchange Act against Goetzeler and Schulte (Count II). In essence, the Amended Complaint alleges that Aixtron made material misrepresentations or omissions related to the progress of the San'an transaction and failed to disclose substantial difficulties that Aixtron encountered in meeting San'an's specifications while attempting to consummate the order.

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's

---

[5] *See* http://bizled.co.in/about-us/

favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). The Court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Under the second prong, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Moreover, Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z–1, 78u–4. *Id.* at 99. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, with intent "to deceive, manipulate or defraud." 15 U.S.C. § 78u–4(b)(1), (2). "Therefore, '[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

Notwithstanding the heightened pleading standards of the PSLRA and Rule 9(b), "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993)).

## DISCUSSION

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5, which implements the statute, prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To recover for a violation of Section 10(b) and Rule 10b–5, a private securities plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 65 (S.D.N.Y. 2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014)).

### 1. **Complaint Fails to Plead Falsity**

The gravamen of Plaintiff's complaint is that Defendants repeatedly spoke about its order with San'an but, in each instance, either falsely characterized the status of the San'an transaction

or misled investors by "[failing] to disclose material information regarding the problems that the Company was experiencing in meeting San'an's specifications." (Pl's Mem. in Opp'n at 8.)

### A. Statements Alleged to Falsely Represent Current Facts

Plaintiff contends that Aixtron made statements that falsely characterized the current state of affairs regarding the San'an transaction. Plaintiff points to two examples. On July 28, 2015, Aixtron stated that "the status of the San'an order is that we – as already mentioned in [CEO] Martin [Goetzeler's] speech, we are in the process of qualifying the tool with this particular device of the customer. (Compl. ¶ 43.)  On October 27, 2015, when asked about the progress of the San'an milestone plan, Aixtron's management stated that they were "following the plan" and are "on plan." (*Id.* ¶ 52.)

These statements were false, according to Plaintiff, because when they were made Aixtron had experienced significant difficulties in qualifying the order placed by San'an, and there was a substantial likelihood that transaction would not ultimately be consummated. Plaintiff relies principally on an account by a confidential witness to demonstrate the falsity of Aixtron's representations. However, the information supplied by CW1 is insufficient to support an inference that Aixtron falsely represented, at any point, the status of the San'an transaction.

CW1 allegedly worked at Aixtron as a senior engineer and project manager from September 2011 until April 2015 – and thus left Aixtron's employ months before either of the two alleged "misstatements" quoted above. CW1 was a member of the workers' council and was one of the employees selected to represent the workforce in meetings with Aixtron's CEO and COO.

The handful of assertions by CW1 contained in the Complaint are principally complaints about Aixtron's handling of the qualification process, the lack of transparency by management,

and Aixtron's refusal to keep the workforce apprised of the "difficulties in meeting San'an's specifications until very late in the process." (*Id.* ¶ 26.)

First, CW1 asserts that when Aixtron started to build the machines, "customers would constantly come up with new ideas to change the process," but Aixtron nevertheless "charged ahead without clarifying the process at the beginning" with the customer. (*Id.* ¶ 25.) Moreover, CW1 complains that Aixtron "failed to conduct a realistic risk assessment" related to the San'an order and "ramped-up production before ensuring that the Company could satisfy the requirements for the order." (*Id.* ¶ 26.)

These assertions, however, are no more than criticisms of Aixtron's operational processes. They in no way contradict or undermine Aixtron's statement to investors that it was "in the process of qualifying the tool" with the customer or that it was "following [the] milestone plan successfully." Whether it would have been good business practice for Aixtron to seek additional clarification from customers at the outset of the qualification process, or conduct a risk assessment, is of no moment for the purposes of Section 10(b) and Rule 10b-5: the fact that Aixtron chose not to do so does not render its statements false or misleading. Aixtron said no more than that it was "in the process" of qualifying the tool and that it was "confident" that it was following the milestone plan with San'an. These statements would have been false or misleading if Aixtron made them knowing full well that it had, for instance, completely halted its qualification process, had no intention of completing the process, or failed in meeting a critical milestone. But nothing in the pleadings, and no information provided by CW1, gives rise to such an inference.

Second, CW1's allegations complain of the lack of transparency by management. Specifically, CW1 asserts that CEO Geotzeler was not "fully forthright" in meetings where

workers' representatives attempted to get more information about the San'an order. According to CW1, Aixtron "did not keep employees sufficiently informed about the problems as they developed and because specifications kept changing, the workplace became rife with rumors." (*Id.* ¶ 26.)

Again, so what? The federal securities laws do not require a company's management to keep its workforce apprised about the progress of its customer transactions. Workplace rumors about what management might be hiding – which appear to be part of the basis of CW1's allegations – are entirely inadequate to support a claim of fraud on the securities markets.

Finally, insofar as CW1 alleges that Aixtron encountered difficulties in fulfilling the San'an order, his allegations are entirely general and conclusory and devoid of specific facts. For instance, CW1 asserts that "over time, it became clear that the contract was not complete and that problems in the qualification process had arisen." (*Id.* ¶ 26.) CW1 also suggests that Aixtron's management "was aware of the problems in the qualification process" and "failed to disclose information regarding the difficulties that Aixtron encountered until very late in the process – when the first 10-20 tools were already in final-assembly phase on the shop floor." (*Id.*) These allegations do not provide any factual support for the general claim that management was aware of problems with the qualification process of the San'an order.

In fact, CW1 principally alleges that management did not keep him or the general workforce abreast of the progress of the San'an order. But if that is so, then CW1 was in no position to know what management did or did not know, or what difficulties the company might have been experiencing, when those difficulties arose, or what impact they might have had on the consummation of the San'an transaction.

In short, CW1's statements do not support a "strong inference" that Aixtron's

management – which had preemptively disclosed that qualification could give rise to problems – was withholding material information about San'an's order from investors.

## B.  Statements Alleged to Be Misleading Due to Omission of Material Facts

Plaintiff also insists that Aixtron's statements were rendered false as a result of material omissions.

Generally, "omissions are actionable under § 10(b) only when a corporation has a duty to disclose." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016). A company has such a duty when "(1) a statute or regulation requires disclosure or (2) disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts." *Id.* A fact is material when there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). There is no duty to disclose information that is "equally available, widely reported, or 'so basic that any investor could be expected to know it.'" *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 645 (S.D.N.Y. 2015) (internal citation and quotation marks omitted).

### i.  Alleged Omissions Related to Fulfillment of San'an Order

According to Plaintiff, Aixtron failed to disclose that: "(1) the AIX R6 MOCVD systems that were to be shipped to San'an did not meet the customer's specific qualification requirements; (2) the Company's agreement with San'an to ship 50 of the Company's AIX R6 MOCVD was unlikely to be executed; and (3) the impending failure to execute the original agreement would have a substantial negative impact on the Company's prospects." (Compl. ¶ 6.) Defendants argue that these alleged omissions do not set forth facts that were omitted, but at

most allege subjective opinions that Aixtron and its management (1) in fact did not hold, and (2) would have had no duty to disclose even if they had held them.

Defendants are correct only in part – if Defendants had actually held the alleged beliefs, they would have had a duty to disclose them. However, Plaintiff has not adequately pled facts to support an inference that Aixtron and its management subjectively believed at any specific point in time that the order by the Chinese LED chip maker could not be completed.

In support of its position that Aixtron had no duty any subjective belief about the future of the San'an order, Defendants point the Court to *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*, 921 F. Supp. 1174, 1176-79 (S.D.N.Y. 1996). In that case, Judge Kaplan evaluated statements related to a $1.3 billion mortgage loan on a property, the principal asset for defendant's common stock. *Id.* The defendant disclosed that the property was operating at a substantial deficit which had been funded by affiliates of the borrowers and also disclosed that the affiliates might cease funding the deficit at any point. *Id.* Plaintiff alleged that the defendant had a duty to disclose its "growing belief" that the funding would stop and that it had "grown concerned" about an affiliate's unwillingness to fund the deficits. *Id.* Plaintiff also alleged that the defendant believed it likely that the borrowers would be unable to meet their obligations and would breach the loan covenant if the funding of the deficits ceased. Judge Kaplan rejected the notion that the omission of these subjective beliefs was a basis for violation of Rule 10-b, noting that the defendant's "subjective worries, concerns, and beliefs were not a matter requiring disclosure." *Id.* He underscored that Rule 10b-5 is concerned with the statement of omission of existing material facts; "[i]t does not require an insider to volunteer any economic forecast." *Id.* (quoting *Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737, 741 (2d Cir. 1978)). Judge Kaplan noted that the defendant had accurately disclosed the existence of the deficits, and the lack of

obligation on the part of the affiliates to continue to fund the deficits; having done so, it had no obligation to disclose its predictions or speculations about future contingencies. *Id.* at 1180-81. However, Judge Kaplan added that if the defendant had indicated optimism that funding would continue, it might well have been required to disclose its subjective belief that funding would cease, because the omission of that information would have made the expression of optimism false or misleading. *Id.*

As per *L.L. Capital Partners*, Aixtron may have had no any pre-existing duty to provide an "economic forecast" as to the outcome of the San'an order. But it did, in fact, make such a forecast – and its forecast was optimistic. At various points, Aixtron provided an optimistic opinion that the San'an order would ultimately be fulfilled and that order's completion would have a substantial impact on company profit. For example, in its December 31, 2014 Annual Report, Aixtron stated that it expected that the San'an order "will have an impact on order intake and revenues in 2015 and beyond" and that "this groundbreaking order by a key market player shows the strong performance and value proposition of the new tool." (Compl. ¶ 34.) To the same effect: on a conference call on July 28, 2015, Goetzeler stated that the company was "in the process of qualifying the tool with this particular device of the customer" and added that management "still expect[s] to ship some systems this year, but [] currently assumes that the majority of shipments will be going into next year." (*Id.* ¶ 44.)

Of course, Defendants point out that Aixtron never flatly stated that the San'an order would inevitably be qualified, and its general disclaimers make it quite clear that not all orders *are* qualified. However, a reasonable investor would understand Aixtron's statement that it "expected that a majority of shipments to go into next year" to mean that, despite significant delays, the order would ultimately be qualified (and likely soon). Because Aixtron expressed

optimism that the San'an order would ultimately be qualified and filled, it would have been required to disclose any genuinely-held belief that the order would not be ultimately qualified at the moment that the belief was formed.

However, there is no indication in the pleadings that Aixtron actually held such a pessimistic subjective opinion. Plaintiff has not pled a single non-conclusory allegation that would support the inference that Aixtron held a subjective belief that its order would not be qualified. Thus, Plaintiff's argument fails.

Additionally, on several occasions, Aixtron made exactly the disclosures that Plaintiff claims were withheld from investors. For example, on July 28, 2015, Aixtron's management stated that "Q2 was a challenging quarter, having been influenced by the ongoing qualification process of our AIX R6, with the respective effects on our margin." (*Id.* ¶ 43.) Management added, "However, we should not hide the fact, together with our major customers, that it has taken longer than we would have liked to get the AIX R6 to the production stage." (*Id.*) These statements are adequate to inform investors that the qualification process was still ongoing and was taking longer than anticipated, thereby impacting company margins. It thus cannot be said that Aixtron falsely represented the status of its qualification process for the San'an transaction. This case is similar to *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007), in which Judge Berman dismissed a Rule 10b-5 claim, holding that the plaintiff had not pleaded falsity; the defendant had disclosed weaknesses in its internal controls, so its failure to disclose separately that its internal accounting function lacked "sufficient personnel resources and technical accounting expertise" to comply with GAAP did not violate Rule 10b-5.

### ii. Alleged Omissions Concerning the Termination of Chinese Subsidies

Plaintiff also alleges that Defendants failed to disclose news that the termination of

Chinese government subsidies and tax incentives to Chinese LED wafer and chip makers would curb capacity expansion by these China-based makers, including San'an. This alleged omission is an alleged omission of material fact – one that would be actionable if it rendered Aixtron's representations misleading to a reasonable investor. Plaintiff contends that Defendants had a duty to disclose news of the termination of subsidies to investors. Plaintiff's claim survives only if he can plausibly plead that the omitted disclosure was "necessary to avoid rendering existing statements misleading by failing to disclose material facts." *See Menaldi*, 164 F. Supp. 3d at 579.

Defendants argue that Aixtron had no duty to make any disclosures about the future termination of Chinese subsidies, because there is no allegation that Aixtron ever made any statement addressing Chinese government subsidies at all. (*See* Def's Mem. in Support at 20.) The Court disagrees. Because Aixtron made a series of representations indicating that the progress of the San'an transaction – the largest order in Aixtron's history – was "on plan," Aixtron had a duty to disclose any material information of which it was aware that might have impacted San'an's ability to complete its order. The termination of government subsidies for San'an, one of the three largest recipients of such subsidies, was surely such a fact.

The real problem with Plaintiff's claim is that, by his own admission, the information that he claims was omitted was public information, equally available to the Defendants and investors alike.

It has long been established that "where information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978); *see also Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014). "Where allegedly undisclosed material information is in fact readily accessible in the public

domain, . . . a defendant may not be held liable for failing to disclose this information." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (quoting *In re KeySpan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 377 (E.D.N.Y. 2003)).

Courts have repeatedly concluded that information is in the public domain when it has been reported by news and media outlets. For instance, in *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 576, the court found that information that AIG was considering a lawsuit against Bank of America was in the public domain since the information was reported nationally and internationally in publications such as *The New York Times, Houston Chronicle, Wall Street Journal,* and *Dow Jones Business News.*

In this case, however, the allegedly omitted information about the termination of Chinese government subsidies was not reported in as widely distributed publications as *The New York Times* or the *Wall Street Journal.* According to the Complaint, the news was published in two articles in industry and region-specific publications – a December 22, 2014 article in *Digitimes* and a December 24, 2014 article in *BizLED* magazine. Plaintiff points to cases that support the proposition that "the mere presence in the media of sporadic news reports" should not be viewed as part of the total mix of information reasonably available to investors. *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *see also New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126-27 (2d Cir. 2013).

However, in each of those cases, the defendant corporation and its officers had information that was not equally available to shareholders. For instance, in *United Paperworkers*, the Second Circuit considered whether defendant's proxy statement opposing a shareholder proposal regarding environmental accountability was misleading, in violation of

Section 14(a) and Rule 14a-9. The defendant was a paper company that was subject to various environmental complaints and litigation. *Id.* at 1195. The defendant disclosed some of the details of its environmental proceedings in its annual report and in its 10-K report filed with the SEC, and "various news reports" also discussed the defendant's environmental litigation." *Id.* With respect to the news reports, the court refused to consider them as part of the "total mix" of information available to shareholders, because the reports were only sporadically present in the media and would not have "clarif[ied] or place[d] in proper context the company's representations in its proxy materials." *Id.* at 1199. However, in that case, the allegedly omitted material information – the details of the defendant's involvement in environmental proceedings – was uniquely in the defendant's possession.

Similarly, in *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126-27 (2d Cir. 2013), the Second Circuit refused to consider as part of the public knowledge that the defendant-appellee, a mortgage funding company, had abandoned its published underwriting guidelines, in spite of the fact that two news articles – a *New York Times* article and a *Forbes* article – had reported about the company's "loose" underwriting standards. The court concluded that these "sporadic news reports" alone did not "clarify or contextualize" the alleged misstatements and omissions in the company's prospectus. *Id.* Again, in *New Jersey Carpenters Health Fund*, the shareholders did not have equal access to the information that was allegedly omitted – that the mortgage funding company had abandoned its underwriting guidelines; this information was uniquely in the possession of the company.

In the instant case, there are no facts to suggest that Aixtron, a German company, had any greater access to information regarding Chinese government subsidies than Plaintiff himself. Indeed, Plaintiff alleges no facts to demonstrate that Defendants knew about the termination of

subsidies to LED chip makers. The only attempt Plaintiff makes to support the notion that

Aixtron knew or "should have known" about the termination of subsidies is to point to the very

articles that reported the news. But Aixtron's investors are as free and as able to read *BizLED*

and *Digitimes* as Aixtron is; the investing public could have learned about the termination of

subsidies as easily as Aixtron's executives could have.

Thus, Defendants' representations were not false or misleading in light of Defendants'

alleged failure to inform investors about the termination of Chinese subsidies to LED chip

makers, such as San'an.

### C. Allegedly Misleading Forward-Looking Statements

Insofar as Plaintiff contends that Defendants violated Section 10(b) and Rule 10b-5

simply by expressing its optimism that the San'an order would be fulfilled, the argument fails.

Courts in this Circuit have routinely declined to find a violation of Section 10(b) in

statements of corporate optimism. Such statements are often considered mere puffery, because

"people in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of

the future." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004). In *Shields v. Citytrust*

*Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994), the Second Circuit evaluated the defendants'

statements predicting a prosperous future and expectations of record earnings that year. The

Court noted that the defendants turned out to be wrong in its prediction but added that

"misguided optimism is not a cause of action, and does not support an inference of fraud." *Id.*

Moreover, the PSLRA provides a safe harbor for forward-looking statements in public

disclosures that are "accompanied by meaningful cautionary statements identifying important

factors that could cause actual results to differ materially" from those predicted. 15 U.S.C. § 78u-

5(c). "To avail themselves of safe harbor protection under the meaningful cautionary language

prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). The cautionary language must be "extensive and specific" and "tailored to the specific future projections, estimates, or opinions" in the statements that plaintiffs challenge. *Id.* (quoting *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009)).

The judicially-created "bespeaks caution" doctrine also offers protection for statements about future performance that are accompanied by adequate cautionary language. Under the bespeaks caution doctrine, the Court analyzes

> the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

Of course, cautionary language about future risk does not insulate a defendant from liability where the defendant fails to disclose that the risk is already present. "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

In this case, Defendants' optimistic statements about the ultimate fulfillment of the San'an order was paired with ample cautionary language adequate to warn of the relevant risks. To illustrate, Aixtron's cautionary statements include the following:

- At any given time, some of AIXTRON's products are being tested to determine whether they meet customer or industry specifications. During such a

qualification period, AIXTRON invests significant resources and dedicates substantial production capacity to the manufacture of these new products, prior to any commitment to purchase by the prospective customer and without generating significant revenues from the qualification process. If AIXTRON was unable to meet these specifications . . . its business, financial condition, results of operations and cash flows could be materially and adversely effected. (2013 Form 20-F, Haviv Decl. Ex. 1 at 7; 2014 Form 20-F, Haviv Decl. Ex. 6 at 7.)

- AIXTRON may increase production in anticipation of customer orders that may not materialize, which would negatively affect the Company's operating results . . . . AIXTRON has in the past experienced . . . outright cancellation of orders. (2013 Form 20-F, Haviv Decl. Ex. 1 at 10; 2014 Form 20-F, Haviv Decl. Ex. 6 at 10.)

- [T]he time it takes the Company to build a product to customer specifications . . . typically ranges from three to nine months, followed in certain cases by a period of customer acceptance during which the customer evaluates the performance of AIXTRON's system and may potentially reject such system. (2014 Form 20-F, Haviv Decl. Ex. 6 at 8.)

- [The latest revenue forecast] includes expected shipments of AIX R6 MOCVD tools which still depend on successfully reaching customer specific milestones within their individual production qualification processes. (Compl. ¶ 40.)

- We should not hide the fact, together with our major customers, that it has taken longer than we would have liked to get the new AIX R6 to the production stage. (Compl. ¶ 43.)

Plaintiff insists that Aixtron's cautionary language constituted merely boilerplate warnings that do not warrant the protection of the PSLRA's safe harbor or the "bespeaks caution" doctrine. Plaintiff alleges that the majority of Aixtron's risk disclosures were identical to disclosures made in its Form 20-Fs more than 10 years ago.

It is true that the "consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was 'tailored to the specific future projection.'" *Slayton*, 604 F.3d 758 (2d Cir. 2010) (internal citation omitted). However, a review of Aixtron's cautionary language shows that the warnings were not merely boilerplate. Instead, several cautionary statements are specific and tailored to risks related to Aixtron's AIX R6 MOCVD tool; they acknowledge the very risks Plaintiff faults for his losses.

Finally, Plaintiff contends that Aixtron's disclaimers were also ineffective, because they failed to warn investors that the risks had already materialized and were of greater magnitude than portrayed. However, Plaintiff does not plead a single non-conclusory fact to support an inference that any undisclosed risks related to the San'an transaction had materialized at all, let alone any that were of a greater magnitude than portrayed.

In a slightly different attempt to argue that Aixtron's optimistic statements about the San'an are actionable under the securities laws, Plaintiff argues that, under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), the representations were statements of opinion that either rested on untrue facts or omitted information that thereby renders the statements misleading. However, for the reasons discussed above, Plaintiff has not pled anything to suggest that Aixtron's representations ignored true facts, recited any "untrue facts," or omitted any information that would have rendered its statements misleading.

In sum, this is classic "fraud by hindsight" pleading. It is well-established that, under Rule 9(b) and the PSLRA, a Section 10(b) claim cannot be sustained by allegations that "an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004). However, that is precisely what Plaintiff alleges here: he argues that because the San'an transaction ultimately went south, Defendants' earlier optimistic statements about the transaction must have been fraudulent. This kind of allegation, without more, is insufficient to sustain a securities fraud claim.

**2. Plaintiff Fails to Plead Scienter**

The PSLRA requires Plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). This requisite state of mind is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x. 26, 27-28 (2d Cir. 2014).

Reckless conduct in the securities fraud context is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)). "[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information." *Gillis v. QRX Pharma Ltd.*, No. 15 Civ. 4868, 2016 WL 3685095, at *13 (S.D.N.Y. July 6, 2016). "Instead, to adequately plead scienter, plaintiffs must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *Id.* (internal quotation and citation omitted). For instance, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.

Plaintiff does not allege any motive on the part of Aixtron to commit fraud. Instead, Plaintiff hopes to support a strong inference of scienter by raising allegations related to Aixtron's

purported conscious recklessness. However, Plaintiff fails to adequately plead facts that would support an inference that Defendants had knowledge or access to information that would have contradicted their statements about the progress of the San'an transaction. Plaintiff's allegation that Defendants' acted with a reckless state of mind rests principally on the account of a single confidential witness. However, as discussed above, CW1's account – which consists of conclusory and unsupported (by actual facts) statements that "AIXTRON's management was aware of the problems in the qualification process" (Compl. ¶ 26) – does not give rise to an inference that Defendants had knowledge or access to information to suggest that the San'an transaction was at risk. CW1's real complaint is that management was less than transparent – specifically, that management did not keep the workforce informed of the progress of the San'an qualification process. The Court cannot reasonably infer that CW1 had any particular insight into management's state of mind. Thus, allegations by CW1 cannot support the "strong inference" of scienter required under the PSLRA.

Plaintiff also contends that the fact that the San'an order was one of Aixtron's "core operations" supports a strong inference of scienter. Plaintiff cites a litany of cases in which courts in this Circuit have found a strong inference of scienter where plaintiffs have alleged that defendants' false or misleading statements concerned the company's "core operations." *See e.g., New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011); *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 Civ. 0950 LAK, 2015 WL 249508, at *9 (S.D.N.Y. Jan. 20, 2015); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010). Plaintiff argues that, because the San'an order was the largest order in Aixtron's history, knowledge that Aixtron's statements about the order were false or misleading can be attributed to the company and its key officers.

However, Plaintiff's argument misses the mark, because it assumes that some of Defendants' representations *were* false or misleading in the first place – something that Plaintiff has not adequately pled. Plaintiff insists that management's denial that there were any issues in the face of direct questions about the transaction is evidence of Defendants' scienter. But Plaintiff points to nothing more than to instances in which Goetzeler or Schulte were asked about the San'an transaction on conference calls and responded that the qualification process was ongoing. There is absolutely nothing in the content or context of these statements to suggest that Defendants were aware of any undisclosed issues that would put the San'an transaction at risk.

Finally, Plaintiff contends that the timing of events surrounding the breakdown of the San'an transaction provides circumstantial evidence of Defendants' reckless state of mind. Plaintiff urges the Court to infer scienter based on the temporal proximity between the last of Defendants' allegedly false statements and the announcement that San'an drastically reduced its order. Defendants' last statements about the San'an transaction were on October 27, 2015, when Aixtron's management stated that they were "quite confident that [they were] following [the] milestone plan successfully." (Compl. ¶ 52). Approximately six weeks later, in December 2015, Aixtron announced that San'an reduced its order from 50 tools to three tools.

It is true that the temporal proximity between an allegedly false statement and a later corrective or inconsistent statement can be relevant to the question of scienter. *See In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006 (S.D.N.Y. 1992); *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 9 (1st Cir. 2006). However, proximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter. In *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. at 1006, the court concluded that plaintiff adequately alleged a strong inference of fraud only after finding that the temporal proximity between statements was

corroborated by a separate allegation that the defendant's negative sales reports undermined its optimistic statements about sales growth. Here, the acknowledged actions by Aixtron and management defeat an inference of scienter. For example, Aixtron did not book the San'an order to recognize revenue from the order, except as related to the three tools that were ultimately delivered. Additionally, Aixtron had successfully completed the qualification process for the new tool with a different customer and had satisfied its first milestone with San'an. These facts support an alternative inference to the one suggested by Plaintiff – that Aixtron and its management were cautiously optimistic about the consummation of the San'an order given the MOCVD tool's early success, but did not want to make any guarantees about (or recognize the benefits of) the transaction's ultimate fulfillment.

### 3. Control Person Liability

In order to state a control person claim pursuant to § 20(a), Plaintiff must allege facts showing (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." *In re Beacon Associates Litig.*, 745 F. Supp. 2d 386, 411 (S.D.N.Y. 2010). Because Plaintiff has not stated a claim for securities fraud against any Defendant, the Court accordingly dismisses the claim of control person liability against Defendants Goetzeler and Schulte.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Counts I and II is GRANTED. Defendants' letter motion for oral argument is DENIED.

The Clerk of the Court is directed to remove Docket Nos. 28 and 38 from the Court's list of pending motions.

Dated: December 20, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL